ORDERED.

Dated:  November 03, 2015

_____
Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 8:11-bk-12150-MGW |
| | Chapter 11 |
| Teltronics, Inc., | |
|     Debtor. | |
| _____/ | |
| Kevin O'Halloran, as Trustee of the Liquidating Trust of Teltronics, Inc., | Adv. No. 8:13-ap-00571-MGW |
|     Plaintiff, | |
| v. | |
| Harris Corporation, et al., | |
|     Defendants. | |
| _____/ | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Teltronics, the Debtor in this bankruptcy case, had the right to block the sale of a patent portfolio owned by Harris Corporation. Teltronics gave up that blocking right for $5,000. Five days later, Harris Corporation sold the patent portfolio to RPX Corporation for $12 million. The Court must decide whether the transfer of Teltronics' blocking right was constructively fraudulent and whether Harris and RPX Corporation are liable for the value of the transfer.

The Court concludes that the Plaintiff, the trustee of a liquidating trust created under the Teltronics' confirmed plan, has failed to meet his burden of proof on his claims under Bankruptcy Code §§ 544 and 550. To begin with, the Plaintiff failed to prove that Teltronics did not receive reasonably equivalent value in exchange for the blocking right. At trial, the Plaintiff only offered evidence of the value of the patent portfolio. But Teltronics did not transfer the patent portfolio—only its blocking right. Putting that aside, the Plaintiff failed to prove Teltronics was insolvent at the time of the transfer. Accordingly, Harris and RPX Corporation are entitled to judgment in their favor on the Plaintiff's claims.

**Findings of Fact**

The relevant facts of this case were, for the most part, undisputed at trial. Teltronics, the Debtor in this chapter 11 case, was in the telecommunications business.[1] Harris Corporation, one of the Defendants, is an international communications company that provides goods and services to governmental and commercial customers.[2] In 2000, Teltronics purchased a division of Harris known as the Enhanced Services Business Unit and, as part of that sale, acquired a patent portfolio that Harris owned.[3]

Initially, Teltronics gave Harris a $6.8 million promissory note for the division and patents it acquired.[4] The amount due on the note, however, was later increased to $9.2 million as part of an amendment to the original sale agreement and a later restructuring of Teltronics'

---

[1] Doc. No. 115 at p. 59, ll. 4-16.

[2] Pl.'s Ex. 90.

[3] Pl.'s Ex. 1; Def.'s Ex. 1; Doc. No. 115 at p. 61, ll. 2-17, p. 98, ll. 11-15.

[4] Def.'s Ex. 2.

obligations under the promissory note.[5] In 2004, Teltronics defaulted under the note and, as of June 1, 2004, owed Harris $9,177,646.27.[6]

In an effort to pay down that debt, Teltronics and Harris entered into a Patent Transfer Agreement.[7] Under that agreement, Teltronics transferred the patent portfolio it had previously acquired from Harris back to Harris in exchange for (i) a $1,275,227.56 credit toward the amount it owed under the restructured promissory note; and (ii) a non-exclusive license to use the patent portfolio to make and sell digital telephone switch products.[8] The Patent Transfer Agreement contained two provisions that are central to this dispute.

First, the Patent Transfer Agreement contained a "blocking right."[9] At the time of the Patent Transfer Agreement, Teltronics was apparently concerned that Harris would sell the patent portfolio to a Teltronics competitor.[10] So Harris expressly agreed not to transfer or convey ownership of the patent portfolio to any third party before July 31, 2010.[11] Second, the Patent Transfer Agreement also gave Teltronics a right of first refusal that allowed Teltronics to reacquire the patent portfolio from Harris in the event Harris intended to sell it after July 31, 2010.[12]

---

[5] Pl.'s Exs. 2 & 3; Def.'s Exs. 7 & 11.

[6] Def.'s Ex. 8.

[7] Pl.'s Ex. 4.

[8] *Id.*

[9] *Id.*

[10] Adv. Doc. No. 115 at p. 99, ll. 7-25.

[11] Pl.'s Ex. 4.

[12] *Id.*

In October 2008, Harris began discussions with RPX Corporation, the other Defendant in this proceeding, about the sale of the patent portfolio.[13] RPX Corporation is a defensive patent aggregator.[14] As such, it acquires patents to prevent patent trolls from asserting patent rights against operating companies that are RPX Corporation clients or members.[15] RPX Corporation had an interest in Harris's patent portfolio because Cisco (one of RPX Corporation's original clients) was concerned that some of the Harris patents may be asserted against it. On December 19, 2008, after several months of negotiations, Harris and RPX Corporation finally agreed on a $12 million purchase price for the patent portfolio, and RPX Corporation wanted to close the sale within the week.[16]

While performing its due diligence, Harris realized it needed to address Teltronics' blocking right, which remained in effect until July 31, 2010, to close the sale with RPX Corporation.[17] So on January 7, 2009, Harris requested that Teltronics modify its blocking right and right of first refusal.[18] Over the following week, Ewan Cameron (Teltronics' CEO) and Scott Mikuen (Harris's Associate General Counsel) exchanged several e-mails about Teltronics' rights under the Patent Transfer Agreement.[19] At one point, Cameron asked Mikuen if Harris had a deal

---

[13] Pl.'s Exs. 14, 23 & 26; Adv. Doc. No. 116 at p. 51, ll. 11-19.

[14] Def.'s Ex. 67 at p. 42, l. 18 – p. 43, l. 2; Pl.'s Ex. 41. A defense aggregator is an entity that acquires patents and takes them off the market to prevent patent trolls or non-practicing entities from asserting infringement claims against certain companies. Adv. Doc. No. 115 at p. 134, ll. 8-16. A patent troll (a pejorative term for non-practicing entity) is a company whose sole business is to acquire patents for the purpose of bringing infringement claims against third parties. Adv. Doc. No. 115 at p. 134, ll. 8-16; Adv. Doc. No. 116 at p. 53, ll. 1-6.

[15] Def.'s Ex. 67 at p. 42, l. 18 – p. 43, l. 2; Pl.'s Ex. 41.

[16] Pl.'s Exs. 32-34.

[17] Adv. Doc. No. 116 at p. 50, l. 11 – p. 51, l. 12; p. 81, l. 25 – p. 82, 19.

[18] Pl.'s Ex. 46.

[19] Pl.'s Exs. 46 & 47.

pending,[20] which it did. Mikuen, however, responded that he would have to defer to Harris's intellectual property group but that it may be possible.[21] Ultimately, Teltronics agreed to modify its blocking right.[22]

Under the First Amendment to Patent Transfer Agreement, which was entered into on January 21, 2009, the parties agreed that Harris had the right to freely transfer the patent portfolio before April 16, 2009.[23] In other words, Teltronics gave up its blocking right. But in no case, could Harris transfer the patents to a Teltronics competitor. The First Amendment to Patent Transfer Agreement also moved up the date the right of first refusal became effective from July 10, 2010 to April 16, 2009.[24] Five days after Teltronics gave up its blocking right, Harris Corporation closed the sale of the patent portfolio to RPX Corporation for $12 million.[25]

Two years later, Teltronics ended up in chapter 11 bankruptcy, and the Plaintiff, who is the trustee of a liquidating trust created under Teltronics' confirmed plan, filed this adversary proceeding seeking to avoid the modification of Teltronics' blocking right under the First Amendment to Patent Transfer Agreement, as well as the transfer of the patent portfolio to RPX Corporation, under Bankruptcy Code § 544.[26] The Plaintiff also seeks to recover the value of those transfers from Harris and RPX Corporation under § 550.[27] In sum, the Plaintiff alleges the

---

[20] Pl.'s Ex. 49.

[21] Pl.'s Ex. 50.

[22] Pl.'s Exs. 54 & 55.

[23] *Id.*

[24] *Id.*

[25] Pl.'s Ex. 58.

[26] Adv. Doc. No. 22.

[27] *Id.*

transfers by Teltronics under the First Amendment to Patent Transfer Agreement were constructively fraudulent because (i) they were made at a time when Teltronics was insolvent; and (ii) Teltronics received less than reasonably equivalent value for the transfers.

During the trial in this proceeding, much was made of the fact that Harris did not affirmatively disclose to Teltronics that it had reached an agreement for the sale of the patent portfolio at the time it was negotiating with Teltronics to modify (or give up) its blocking right. Teltronics' CEO (Ewan Cameron) testified at trial that he was not told of the pending sale to RPX and that he did not learn the patents were sold for $12 million until trial. The Plaintiff contends, in its post-trial brief, that Teltronics would have taken some action had it known about the pending sale. Harris, for its part, does not dispute that it did not disclose the pending transaction. But it offers an explanation for not doing so: it was subject to a nondisclosure agreement with RPX Corporation that prohibited Harris from revealing RPX Corporation as a potential purchaser. In the end, this case is not about whether Harris should have disclosed its deal with RPX Corporation to Teltronics; the sole issue before the Court is whether the transfer of the blocking right was a constructively fraudulent transfer and, if so, whether Harris and RPX Corporation are liable for the value of the transfer.

## Conclusions of Law

To prevail on his constructive fraud claims at trial, the Plaintiff must establish two central elements.[28] First, the Plaintiff must show that Teltronics received less than reasonably equivalent

---

[28] *Pearlman v. SunTrust Mtg. (In re Pearlman)*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014). "In fraudulent transfer actions, there is a distinction between avoiding the transaction and actually recovering the property or the value thereof." *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008) (quoting *In re Int'l Admin. Servs.*, 408 F.3d 689, 703 (11th Cir. 2005)). It is not until the Court determines that a transfer is avoidable that it must determine whether the recipient of the transfer is liable for return of the property or payment of the property's value under Bankruptcy Code § 550. *In Pearlman*, 515 B.R. at 895.

value for the transfer of its blocking right.[29] Second, the Plaintiff must show Teltronics was insolvent at the time of the transfer.[30] Because the Plaintiff is the one seeking to avoid the transfers, he bears the burden of proving both elements by a preponderance of the evidence.[31] The Plaintiff, however, fails to prove by a preponderance of the evidence that Teltronics did not receive reasonably equivalent value in exchange for the transfer or that it was insolvent at the time the transfer was made.

## The Plaintiff failed to prove Teltronics did not receive reasonably equivalent value.

The Plaintiff offered two main pieces of evidence to satisfy its burden that Teltronics did not receive reasonably equivalent value. The first piece of evidence was the expert testimony of Robert Goldman (Charles River Associates), who opined that the fair market value of the patents at the time of the transfer was $14 million.[32] While the Plaintiff acknowledges that Harris's expert (Dr. McDuff) criticized Goldman's methodology, the Plaintiff notes that Dr. McDuff's analysis was likewise flawed and, more importantly, that Dr. McDuff failed to offer any opinion as to value of the patent portfolio.[33] The second piece of evidence offered by the Plaintiff was an internal valuation of the patent portfolio by Harris in November 2008, which showed the patents were worth somewhere between $11.7 million and $28.65 million.[34] This evidence, while somewhat persuasive on its face, ultimately misses the mark.

---

[29] *In re Pearlman*, 515 B.R. at 894.

[30] *Id.*

[31] *Id.*

[32] Adv. Doc. No. 117 at p. 6, l. 7 – p. 8, l. 1; p. 16, l. 9 – p. 65, l. 3.

[33] Adv. Doc. No. 122 at 14-15.

[34] Adv. Doc. No. 116 at p. 75, ll. 19-23; p. 83, l. 3 – p. 85, l. 6; Pl.'s Ex. 25.

The problem with that evidence is that the transfer at issue (i.e., the First Amendment to Patent Transfer Agreement) does not involve the transfer of the patent portfolio. Of course, Teltronics could not have transferred the patent portfolio because Teltronics no longer owned it. Teltronics had transferred the portfolio to Harris more than four years earlier.[35] The only thing Teltronics could have transferred was its blocking right or right of first refusal. Notably, the Plaintiff failed to offer any specific evidence of the value of the blocking right or right of first refusal. Instead, the Plaintiff argued in its post-trial filings that the value of the right of first refusal is equal to the fair market value of the patent portfolio less the option price.[36]

The Plaintiff cites three cases in support of that proposition.[37] The Plaintiff argues that *In re Thomas*, which was decided by the Eleventh Circuit two years ago, stands for the proposition that a prepetition option contract creates an interest in both the underlying property and any proceeds derived from the sale of that property.[38] Moreover, the Plaintiff says *Thomas*—along with *In re JTS Corp.* and *In re Calvillo*—stands for the proposition that the proper measure of damages in a fraudulent transfer case involving an option contract is the value of the underlying property less the option price.[39] All of that is true, but those cases do not dictate that the value of Teltronics' blocking right here is equal to the fair market value of the patent portfolio (less any option price).

---

[35] Pl.'s Ex. 4.

[36] Adv. Doc. No. 123 at 2-3.

[37] *Id.* (citing *Thomas v. Bender (In re Thomas)*, 516 F. App'x 875, 878 (11th Cir. 2013); *Decker v. Tramiel (Matter of JTS Corp.)*, 617 F.3d 1102, 1110 (9th Cir. 2012); *Lowe v. BRB Enters., Ltd. (In re Calvillo)*, 263 B.R. 214, 220 (W.D. Tex. 2000)).

[38] *Id.* (citing *In re Thomas*, 516 F. App'x at 878).

[39] *Id.* (citing *In re Thomas*, 516 F. App'x at 878; *In re JTS Corp.*, 617 F.3d at 1110; *In re Calvillo*, 263 B.R. at 220).

In relying on those cases to advocate for a one-size-fits-all conception of damages in fraudulent transfer cases like this one, the Plaintiff overlooks the most salient point raised by the *Calvillo* court: "[C]ourts have recognized valuation considerations are inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction."[40] In *Calvillo* and *JTS Corp.*, as well as *Thomas*, the courts determined that the facts of those cases warranted finding that the value of the option contract was the same as the value of the underlying property.[41] But that measure of damages is not appropriate in this case.

There is one crucial distinction between this case and the ones the Plaintiff relies on. All of the cases the Plaintiff relies on involve true option contracts where the debtor had or gave a third party the option to buy the underlying property at any time. In *Thomas*, the debtor had the unfettered right to buy real property from a third party for $112,450.[42] In *Calvillo*, the debtor sold real property (along with personal property and business assets) to third parties in exchange for $400,000 cash, a lease-back agreement, and an option to repurchase the property at any time during the three-year lease term (provided the lease was not in default).[43] Similarly, in *JTS Corp.*, the debtor sold real property to a board member for $10 million but retained an option to reacquire the property for $10 million plus the greater of $1 million or the rental income generated by the property for a one-year period.[44] Here, unlike in *Thomas*, *Calvillo*, and *JTS Corp.*, Teltronics did not have the right to purchase the patent portfolio at any time.

---

[40] *In re Calvillo*, 263 B.R. at 220.

[41] *In re Thomas*, 516 F. App'x at 878; *In re JTS Corp.*, 617 F.3d at 1110; *In re Calvillo*, 263 B.R. at 220.

[42] *In re Thomas*, 516 F. App'x at 876-77.

[43] *In re Calvillo*, 263 B.R. at 216-17.

[44] *In re JTS Corp.*, 617 F.3d at 1106-07.

Instead, under the original Patent Transfer Agreement, Teltronics only had the right to block any transfer of the patent portfolio before July 31, 2010.[45] And that is all it gave up. To be sure, once the blocking right was gone (even for a limited time), the right of first refusal that would only ripen down the road would likewise be gone. Because Teltronics did not have the right to reacquire the patent portfolio for another eighteen months (assuming Harris still wanted to sell it at that point), however, it would be inappropriate to value the blocking right equal to the fair market value of the patent portfolio.

It is possible to speculate that Teltronics could have negotiated a higher price for the blocking right had it known definitively that Harris had a $12 million agreement to sell the patent portfolio to RPX Corporation. It is not unreasonable to surmise Harris would have paid more than $5,000 in order to quickly close its sale with RPX Corporation. But there was no evidence offered on that point. And it is worth noting that it is not clear that Harris even needed to sell the patent portfolio to RPX Corporation to accomplish the parties' objectives for the transaction since it went unrebutted that the same objective could have been accomplished by Harris granting RPX Corporation an exclusive license, in which case neither the blocking right nor the right of first refusal would have come in to play.[46]

In short, the Plaintiff had the burden of proving Teltronics did not receive reasonably equivalent value for the blocking right.[47] Because Teltronics did not have the right to acquire the patent portfolio at the time it gave up its blocking right, it would be inappropriate to value the blocking right the same as the patent portfolio itself. And since the Plaintiff did not present any

---

[45] Pl.'s Ex. 4.

[46] Adv. Doc. No. 115, p. 161, ll. 12-22; Adv. Doc. No. 117 at p. 143, l. 10 p. 145, l. 2.

[47] *Pearlman v. SunTrust Mtg. (In re Pearlman)*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014).

evidence on the value of the blocking right (other than the value of the patent portfolio), the Court concludes the Plaintiff failed to prove by a preponderance of the evidence that Teltronics received less than reasonably equivalent value for the transfer.

The Trustee failed to prove Teltronics
<u>was insolvent at the time of the transfer</u>.

Even if the Plaintiff had proven that Teltronics failed to receive reasonably equivalent value, it nonetheless failed to prove Teltronics was insolvent at the time of the transfer. The question of insolvency largely comes down to competing expert testimony. The Plaintiff offered the expert testimony of Barry Mukamal, who opined that Teltronics was insolvent by approximately $5.6 million at the time of the transfer.[48] The expert offered by Harris and RPX Corporation, Steve Oscher, opined that Teltronics was comfortably solvent by more than a few million dollars.[49] Both experts, who are highly respected by this Court, largely followed the same approach.

Mukamal based his solvency analysis on Teltronics' balance sheet.[50] According to its 2008 Form 10-K, Teltronics had approximately $12.6 million in assets and $21.7 million in liabilities, which meant the company was insolvent by more than $9.1 million based on its balance sheet alone.[51] With one exception, Mukamal assumed that the fair value of Teltronics' assets approximated their book value, as reflected in Teltronics' audited financial statements.[52] When it came to the estimated sale value of finished goods inventory, however, Mukamal

---

[48] Adv. Doc. No. 116 at p. 112, l. 15 – p. 119, l. 16.

[49] Adv. Doc. No. 118 at p. 6, l. 25 – p. 19, l. 15.

[50] Adv. Doc. No. 116 at p. 116, l. 24 – p. 117, l. 13.

[51] *Id.* at p. 117, l. 25 – p. 118, l. 20; p. 119, ll. 2-4.

[52] *Id.* at p. 118, ll. 4-10.

adjusted the value upward by $510,010.[53] Mukamal also excluded $3 million in deferred dividends from Teltronics' liabilities.[54] Taking into account his balance sheet adjustments, Mukamal opined Teltronics was insolvent by $5.6 million as of December 31, 2008.[55]

Critically, there was one major difference between Mukamal's approach and the one taken by Oscher. Oscher agreed with Mukamal that the value of the finished goods inventory should be adjusted upward, although he disagreed with the precise amount.[56] Oscher likewise agreed with Mukamal that $3 million in deferred dividends should be excluded from liabilities.[57] The primary difference between the two experts was that Oscher opined that the value of Teltronics' assets should be adjusted to include certain maintenance contracts that were not reported on the company's balance sheet.[58]

Teltronics had been a party to three major maintenance contracts with the New York Department of Corrections, the Federal Bureau of Prisons, and the New York Board of Education.[59] Teltronics took assignment of those contracts from Harris back in 2000, when Teltronics acquired the Harris division. Although the maintenance contracts generated a positive cash flow, they were not reported on Teltronics Form 10-K because of the company's accounting policy.[60]

---

[53] *Id.*

[54] *Id.* at p. 118, ll. 11-17.

[55] *Id.* at p. 119, ll. 13-16.

[56] Adv. Doc. No. 118 at p. 13, l. 10 – p. 14, l. 17.

[57] *Id.* at p. 14, ll. 1-10.

[58] *Id.* at p. 12, ll. 4-12; p. 14, ll. 18-21; p. 15, l. 9 – p. 19, l. 15.

[59] Def.'s Exs. 71-75; Adv. Doc. No. 115 at p. 111, ll. 4-10; Adv. Doc. No. 118 at p. 15, ll. 13-19.

[60] Adv. Doc. No. 115 at p. 115, ll. 1-5; Adv. Doc. No. 117 at p. 124, l. 4 – p. 125, l. 5; p. 125, l. 19 – p. 126, l. 6.

Oscher opined, for purposes of his solvency analysis, that the value of the maintenance contracts was $8.5 million.[61] That opinion was based on the following: (i) a May 2005 Credit Committee Memorandum, prepared by CapSource in conjunction with its decision to extend an $8 million revolving line of credit and a $3 million loan to Teltronics, in which CapSource stated the maintenance contracts generated approximately $9.5 million in revenue annually; (ii) a Wells Fargo Financing Memorandum stating that its credit facility would be fully collateralized by recurring revenues from the maintenance contract; (iii) a May 3, 2007 draft report by Empire Valuations valuing the fair market value of the maintenance contracts at approximately $18 million; (iv) a January 20, 2011 letter of intent by Black Box offering to buy two of the maintenance contracts for $12 million (subject to certain approvals and due diligence); and (v) a September 3, 2011 valuation report by Empire concluding that the fair market value of the contracts ranged from $5.7 million to $11.3 million, with $8.5 million as a midpoint.[62] Oscher used the $8.5 million midpoint from the Empire valuation for his analysis, and when that number is added back into Teltronics' balance sheet, the company is solvent by more than a few million dollars.[63]

The Plaintiff and his expert (Mukamal) dispute Oscher's analysis on a variety of grounds.[64] For starters, Mukamal says it is improper to add the value of the maintenance contracts back into the balance sheet.[65] And even if the value of the contracts is added back in, Mukamal says Oscher's proposed valuation is completely unreliable. According to the Plaintiff,

---

[61] Adv. Doc. No. 118 at p. 17, l. 15 – p. 18, l. 15.

[62] *Id.* at p. 16, l. 18 – p. 19, l. 6.

[63] *Id.* at p. 17, l. 15 – p. 18, l. 15; p. 19, ll. 10-15.

[64] *Id.* at p. 58, l. 7 – p. 69, l. 3.

[65] *Id.* at p. 59, l. 5 – p. 60, l. 9.

Oscher chose the $8.5 million midpoint somewhat arbitrarily.[66] Worse, Mukamal contends, Oscher made no independent evaluation of the projections or assumptions underlying the 2011 Empire valuation.[67] Ultimately, whether Teltronics was insolvent comes down to which expert the Court finds more credible.

On the issue of whether the maintenance contracts ought to be separately valued and added into the balance sheet, the Court finds Oscher more credible. Oscher testified that the contracts should be included because they are separable and transferrable.[68] He also testified that literature by Robert Reilly supports that valuation methodology.[69] Significantly, Mukamal does not dispute the fact that valuing an intangible asset on its own and adding it into the balance sheet is a generally accepted accounting principle adjustment.[70] In fact, he specifically testified that it is done and that it is generally accepted.[71] He simply opined that it would require the expert to separate the intangible asset from the organization and evaluate it, as well evaluate the effect it would have on the organization after it was removed and the costs associated with administering the asset.[72] But Mukamal never credibly explained why it was inappropriate to do that here.[73]

---

[66] *Id.* at p. 33, ll. 4-25.

[67] *Id.* at p. 60, l. 10 – p. 69, l. 3.

[68] *Id.* at p. 15, l. 9 – p. 16, l. 2.

[69] *Id.* at p. 27, l. 4 – p. 29, l. 15.

[70] Doc. No. 116, p. 123, l. 25 – p. 124, l. 9.

[71] *Id.*

[72] *Id.* at p. 124, ll. 10-20.

[73] *Id.* at p. 125, ll. 20-23.

It appeared Mukamal believed it was inappropriate because an intangible asset that generates cash flow cannot be considered in a vacuum if the cash flow generated by the asset is necessary for the overall operation and value stream in a discounted cash flow model.[74] But his insolvency analysis was not based on a discounted cash flow analysis. Mukamal also believed Oscher's methodology was flawed because he did not separate out the asset and consider the effect removal has on the company.[75] The burden was on the Plaintiff, however, to prove that contracts should not have been separately valued and added to the balance sheet, and it failed to do that here.

The Plaintiff's stronger argument is that Oscher's valuation of the maintenance contracts is unreliable. To be fair, the Plaintiff raises a number of valid points calling into question the $8.5 million valuation.[76] For one thing, Oscher concedes he did not independently evaluate the underlying projections and assumptions in the Empire valuation he relied on.[77] Mukamal also points out that other information Oscher relied on—such as the Wells Fargo analysis, CapSource memorandum, and the Black Box letter of intent—really were not valuations at all.[78] And the Plaintiff raises other grounds. While the Court acknowledges that the Plaintiff's objections, overall, do impact the weight it gives to Oscher's proposed valuation of the maintenance contracts, the Plaintiff overlooks the fact that it bears the burden of proof on insolvency.[79]

---

[74] Adv. Doc. No. 118 at p. 59, l. 12 – p. 60 l. 2.

[75] *Id.* at p. 59, l. 5 – p. 60, l. 9.

[76] *Id.* at p. 60, l. 10 – p. 69, l. 3.

[77] *Id.* at p. 34, l. 10 – p. 39, l. 23.

[78] *Id.* at p. 60, l. 10 – p. 69, l. 3.

[79] *Pearlman v. SunTrust Mtg. (In re Pearlman)*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014); *In re Fin. Federated Title & Trust, Inc.*, 252 B.R. 834, 838 (Bankr. S.D. Fla. 2000).

Because the Court concludes the maintenance contracts should be included in the balance sheet, it is the Plaintiff's burden to prove the value of the maintenance contracts, when added to the other assets, do not exceed Teltronics' liabilities. Based on the balance sheet, Teltronics' liabilities exceed their assets by approximately $5.6 million. Accepting all of the Plaintiff's objections to Oscher's $8.5 million valuation only means the contracts are not worth $8.5 million. But it does not mean they are worth less than $5.6 million, which is what the Plaintiff must show to prove Teltronics was insolvent at the time of the transfer. The Plaintiff offered no evidence of the value of the maintenance contracts, and as a consequence, they have failed to meet their burden of proving Teltronics was insolvent at the time it transferred its blocking right.

**Conclusion**

At trial, the parties raised a number of factual and legal issues, but in the end the case turns on two factual questions: (i) Was the blocking right worth more than $5,000?; and (ii) Were the maintenance contracts worth less than $5.6 million? To prove lack of reasonably equivalent value, the Plaintiff had the burden of proving that the blocking right was worth more than $5,000. To establish insolvency, the Plaintiff had to prove the maintenance contracts were worth less than $5.6 million. Because the Plaintiff failed to carry its burden of proof on either issue, it cannot prevail on its claim to avoid and recover the value of the transfer under the First Amendment to Patent Transfer Agreement, and therefore, Harris and RPX Corporation are entitled to judgment in their favor.

Attorney Brian A. McDowell is directed to serve a copy of these Findings of Fact and Conclusions of Law on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the Findings.

**Brian A. McDowell, Esq.**
**Samuel J. Zusmann, Jr., Esq.**
**Robert W. Davis, Jr., Esq.**
**Holland & Knight, LLP**
   *Attorneys for Defendants*

**Morris D. Weiss, Esq.**
**Mark C. Taylor, Esq.**
**Hohmann, Taube & Summers, LLP**
   *Attorneys for Plaintiff*